| | |
|---|---|
| **VIVIANA MALDONADO, and JORGE RODRIGUEZ, Individually and as Co-Special Administrators and Co-Special Representatives of the Estate of STEPHANIE RODRIGUEZ, Deceased,** ) ) ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | **No. 08 C 6141** |
| **MOUNT SINAI HOSPITAL MEDICAL CENTER OF CHICAGO; UNITED STATES OF AMERICA; IBRAHAM DOGAN, M.D.; CLARA LOPEZ, R.N.,** ) ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Viviana Maldonado and Jorge Rodriguez allege that medical negligence during the May 7, 2004 delivery of their baby at Mt. Sinai Medical Center caused the baby's death. They brought suit in state court against six Defendants: Mt. Sinai; Access Community Health Network, a federally funded health network; Marlene Green, M.D., an employee of that network; the United States; and Ibraham Dogan, M.D., and Clara Lopez, R.N., both employees of Mt. Sinai. The case was removed to federal court and the United States was substituted as Defendant for Green and Access, who were dismissed from the case. (Order of Feb. 26, 2009.) Defendants Mt. Sinai, Dogan, and Lopez move for summary judgment on all claims against them. For the reasons that follow, their motion is granted as to the two claims against Mt. Sinai only, the two claims against Lopez and Mt. Sinai, and otherwise denied.

## FACTUAL BACKGROUND

On the night of May 6, 2004, Maldonado arrived at Mt. Sinai in labor, accompanied by Rodriguez. (Maldonado Dep., at 12.) Maldonado's prenatal doctor, Lemuel Shaffer, was not at the hospital, so Dr. Green, who had never seen Maldonado before 2:00 a.m. on May 7, 2004, acted as

attending physician. (Pls' Rule 56.1(b)(3)(a) ¶¶ 1-2.) Maldonado was also treated by Clara Lopez, a registered nurse, and by Dr. Dogan, a first-year resident and obstetrician certified in his native Turkey. (*Id.* ¶ 4.) When Maldonado arrived at the hospital, an electronic heart rate monitor was attached that showed a fetal heart rate characterized as "reassuring." (*Id.* ¶ 7.) A fetal heart rate is reassuring if the heart is beating at an average of between 120 and 160 beats per minute; if the variability—a measure of the deviation of the heart rate from the average—is between 6 and 25 beats per minute; and if there are accelerations (temporary increases) in the heart rate but no decelerations. (*Id.* ¶ 9.) If the heart rate does not meet those conditions, it is "nonreassuring" and cause for concern. (*Id.* ¶ 9.)

At 2:30 a.m. on May 7, 2004, Maldonado was given Pitocin on Dr. Dogan's orders. (Pls' Rule 56.1(b)(3)(a) ¶ 16.) Pitocin is the brand name of oxytocin, a drug used to induce labor. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1299, 1392 (29th ed. 2000). By 3:10 a.m., Maldonado's contraction rate increased above the normal level—in medical terms, the rate became tachysystolic—and the Pitocin was stopped at 3:20 a.m. (*Id.* ¶¶ 14, 17, 18.) Between 4:00 a.m. and 4:30 a.m., the fetal heart rate rose above the normal level—that is, it became tachycardic—indicating that the fetus was not getting enough oxygen. (*Id.* ¶ 18.) At 4:30 a.m., variable decelerations in the fetal heart rate began, indicating that the spinal cord was compressed and that the baby was not getting enough blood or oxygen. (*Id.* ¶ 19.) This pattern continued through 5:30 a.m. (*Id.* ¶ 20.) The doctors did not respond to the change in fetal heart rate until 5:25 a.m., when Dr. Dogan ordered Lopez to restart the Pitocin and Lopez did so. (*Id.* ¶ 21.) The fetal heart rate continued to decelerate, and Drs. Dogan and Green unsuccessfully attempted a vacuum-assisted delivery at 6:10 a.m. (*Id.* ¶¶ 22-23.) At 6:30 a.m., Dr. Green called for a Caesarean delivery and baby Stephanie Rodriguez was delivered by Caesarean at 7:06 a.m. (*Id.* ¶ 25.) The baby had no heartbeat, and a specialist failed to resuscitate her. (Srinivasan Dep., at 27-36.) The Certificate of Death states the time of death as 7:45 a.m. (Pls' Ex. 10.)

James Rice, a board certified obstetrician and gynecologist, provided expert testimony for Plaintiffs. According to Rice, Drs. Dogan and Green deviated from the reasonably accepted standard of care by failing to suspect that the baby was macrosomic or abnormally large. (Rule 26(a)(2) Disclosure of Rice, at 3.) Rice asserted that Dogan and Green should have realized that a successful vaginal delivery was unlikely based on the baby's advanced gestational age (40 weeks and 3 days), Maldonado's small size (5'1" tall with a "narrow pubic arch"), and her high weight gain (47 pounds). (*Id.*, at 3-4.) Rice also stated that Dogan and Green failed to respond appropriately when the baby's fetal heart rate became nonreassuring by providing additional oxygen and changing the mother's position. Rice believes that the doctors should have ordered a Caesarean delivery at 4:45 a.m. (*Id.* at 4.) According to Rice, had a Caesarean delivery been performed any time before 5:25 a.m., the baby would have been delivered normally. (*Id.*) Instead of ordering a Caesarean delivery, the doctors restarted the oxytocin and attempted a vacuum-assisted delivery, both acts that, Rice contends, deviated from the standard of care. (*Id.* at 4-5.) Rice concluded that Dogan's and Green's deviations from the standard of care caused the baby's death. (*Id.* at 5.)

Charlotte Daniels, a registered nurse certified in, among other fields, electronic fetal monitoring, also provided expert testimony for Plaintiffs. She stated that Lopez deviated from the standard of care when she restarted the Pitocin on Dr. Dogan's orders at 5:25 a.m. (Pls' Rule 56.1(b)(3)(a) ¶ 36.) Lopez herself testified that she knew that restarting the Pitocin was a deviation from the standard of care, but she followed orders anyway. (*Id.* ¶ 21.) According to Daniels, Lopez should have known that restarting the Pitocin was dangerous and should have questioned Dr. Dogan's order. (Daniels Dep., at 107.) If Dogan had persisted, Daniels asserted, Lopez should have gone over his head and spoken to the supervising nurse—Daniels referred to that course of action as "going up the chain of command." (*Id.*) Again, Lopez agreed with Daniels's assessment of what she should have done. (Lopez Dep., at 94-97.) Daniels also stated that by 4:30 a.m., when

the doctors had failed to respond to the baby's nonreassuring fetal pattern, Lopez should have alerted the supervising nurse. (Daniels Dep., at 138-40.)

Plaintiffs' complaint includes six claims: Claim One is for wrongful death and is brought against all Defendants except Lopez, Claim Two is a survival action also brought against all Defendants except Lopez, Claims Three and Four are a claim for wrongful death and a survival action brought against Mt. Sinai alone, and Claims Five and Six are a claim for wrongful death and a survival action brought against Lopez and Mt. Sinai.

<u>ANALYSIS</u>

A.    **Motions to Strike**

The court first addresses the parties' motions to strike each others' statements of facts. Such motions are disfavored except when they serve to expedite the work of the court. *RLJCS Enterprises, Inc. v. Professional Benefit Trust, Inc.*, 438 F. Supp. 2d 903, 906-07 (N.D. Ill. 2006). Defendants' primary argument in support of their motion to strike Plaintiffs' entire statement is that the statement does not comply with Local Rule 56.1(b)(3)(a) because it does not present facts that would defeat summary judgment. If Defendants are right, though, the court should simply grant their motion for summary judgment. Thus, Defendants' motion to strike does nothing to expedite matters. The motion also complains that several of the paragraphs in Plaintiffs' statement contain multiple statements of fact in violation of Rule 56.1, but Defendants provide no citation to any such paragraphs. Defendants' motion to strike is denied.

Plaintiffs' motion is more limited; they ask only that the court strike three of Defendants' statements: paragraph 14 for stating a legal conclusion and paragraphs 17 and 18 for containing no reference to the record. Paragraph 14 states that "Dr. Green was responsible for the medical decisions made throughout the course of the patient's treatment." (Defs' Rule 56.1(b)(3)(a) ¶ 14.) This could conceivably be a read as an impermissible legal conclusion, but based on the citation to Dr. Green's deposition, it is more accurately read as merely recounting her understanding of her

own responsibilities. (Green Dep., at 155.) The request to strike paragraph 14 is denied. The court also declines to strike paragraphs 17 or 18 because the absence of any citation to the record for those paragraphs is easily explained: both paragraphs state that Plaintiffs failed to submit any evidence on a certain issue. The whole point of each paragraph is that no supportive reference to the record exists, so requiring such a reference would be nonsensical. For these reasons, Plaintiffs' motion to strike is denied.

## B.    Motion for Summary Judgment

The court will grant summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

### 1.    Defendant Lopez

Defendants argue that Nurse Lopez is entitled to summary judgment on Claims Five and Six because Plaintiffs failed to present expert testimony establishing the elements of a medical malpractice claim. (Defs' Br., at 4-6.) Under Illinois law, a plaintiff succeeds on a claim of medical negligence by showing "(1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care." *Neade v. Portes*, 193 Ill.2d 433, 443-44, 739 N.E.2d 496, 502 (2000). And, in all but the most extreme cases, each element must be proven by expert testimony. *Purtill v. Hess*, 111 Ill.2d 229, 241-42, 489 N.E.2d 867, 872 (1986).

Defendants correctly assert that neither of Plaintiffs' experts testified that Lopez's conduct

was a proximate cause of the baby's death. (Defs' Br., at 5.) Daniels, Plaintiffs' nursing expert, stated that, as a nurse, she could not testify regarding the cause of the baby's death. (Daniels Dep., at 92.) Rice, Plaintiffs' obstetrical expert, did testify about the cause of the baby's death, but specifically stated that he was offering no opinion on Mt. Sinai's nursing staff. (Rice Dep., at 24.) This lack of testimony directly connecting Lopez's conduct to the baby's death does not necessarily doom Plaintiffs' case against Lopez; because medical negligence, like any other factual question, can be proven by combining evidence from more than one source. Yet even construing the record in the light most favorable to Plaintiff's claims, the evidence does not connect Lopez's alleged negligence to the baby's death. Rice stated that if a Caesarean delivery had been initiated by 5:25 a.m., the baby would not have died. (Rule 26(a)(2) Disclosure of Rice, at 4.) Daniels contends that Lopez had a duty to go over the heads of the attending doctors when they did not respond to the baby's nonreassuring fetal heart rate and when they ordered restarting of Pitocin. (Pls' Rule 56.1(b)(3)(a) ¶ 36; Daniels Dep., at 107.) Plaintiffs note these two pieces of evidence in their brief, but do not connect them. (Pl's Br., at 13.) In short, Plaintiffs have failed to identify any evidence from which a jury could find that had Lopez acted as Daniels testified she should, a Caesarean delivery would have been initiated early enough to save the unborn baby's life. Accordingly, Defendants' motion is granted with respect to the claims against Lopez.

### 2. Defendant Dogan

Defendants next argue that Dogan is entitled to summary judgment on Claims One and Two. First, Defendants seek to rely on Plaintiffs' failure to present expert testimony on the standard of care for a first-year resident. (Defs' Br. at 6-8.) Plaintiffs respond with specifics about Dr. Dogan's training to show that he should be held to the same standard as a doctor who has completed a residency, (Pls' Br. at 12), but those details are irrelevant because the standard of care is not determined on an individualized basis. *Advincula v. United Blood Services*, 176 Ill.2d 1, 22-23, 678 N.E.2d 1009, 1020 (1996) ("In Illinois, the established standard of care for all professionals

is stated as the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances."). Both sides have overlooked the Seventh Circuit's ruling that Illinois law "holds residents to the same standard of care as physicians who have completed their residency in the same field of medicine." *Arpin v. United States*, 521 F.3d 769, 774-75 (7th Cir. 2008). Thus, Plaintiffs were not required to present evidence on a special standard of care for first-year residents.

Defendants next argue that Dr. Dogan cannot be liable because he made no independent decisions and deferred to the decisions made by Dr. Green, the attending physician. (Defs' Br., at 8-10.) As support for their assertion, Defendants seek to rely on Rice's testimony that a resident is expected to defer to the attending physician. (Defs' Reply Br. at 5.) Significantly, Rice qualified this statement by saying, "I would expect [the resident] to defer to the attending *as long as it didn't put the patient at risk.*" (Rice Dep., at 34) (emphasis added.) When combined with Rice's testimony that Dogan's conduct did put Maldonado's unborn child at risk, this statement is sufficient to support Plaintiffs' assertion that Dogan's conduct fell below the standard of care. Moreover, there is evidence that Dogan did make at least one independent decision: Lopez testified that it was Dogan who ordered her to restart the Pitocin, and Green confirmed that she did not order it. (Lopez Dep., at 61; Green Dep., at 72.)

Finally, Defendants argue that Rice's causation opinions are not admissible expert evidence because they are unsupported by any reliable scientific methodology. (Defs' Br., at 10-13.) Defendants insist that an opinion based on an expert's experience is inadmissible unless the expert cites literature in support of the opinion or conducts a study to prove it. Not so. Federal Rule of Evidence 703 specifically allows experts to rely on material "reasonably relied upon by experts in the particular field in forming opinions or inferences." When a doctor diagnoses a patient, she is not expected to cite literature or conduct a study in support of her diagnosis. A medical opinion that relies on professional experience is admissible expert testimony. *Cooper v. Carl A. Nelson & Co.*,

211 F.3d 1008, 1020 (7th Cir. 2000). Rice's opinion that the failure to perform a Caesarean delivery earlier caused the unborn baby's death was supported by his professional experience and relied on the records of fetal heart rate, the observation about Maldonado's narrow pubic arch, Rice's opinion that the fetus was probably macrosomic, and the position of the fetus. (Rule 26(a)(2) Disclosure of Rice, at 5.) Rice's testimony is admissible expert testimony. Defendants are free to challenge his conclusions at trial or to present evidence that an earlier Caesarean would have been impossible or would have made no difference. They have not established the absence of a material dispute, however. The motion for summary judgment is denied as to Dogan.

### 3. Defendant Mt. Sinai

Defendants' final argument is that Mt. Sinai is entitled to summary judgment on all claims against it. Defendants assert that Plaintiffs have presented no evidence in support of Claims Three and Four, which allege institutional medical malpractice by the hospital. (Defs' Br. at 13.) Plaintiffs do not contest Defendants' assertion, and the court agrees that the evidence offered by Plaintiffs does not identify any institutional negligence. Summary judgment is granted as to Claims Three and Four.

Defendants also argue that no facts support Plaintiffs' allegations that Green was acting as Mt. Sinai's actual agent. (*Id.*) Under Illinois law, though, a hospital may be held liable for the negligent conduct of an independent doctor under a theory of apparent authority "'unless the patient knows, or should have known, that the physician is an independent contractor.'" *York v. Rush-Presbyterian-St. Luke's Medical*, 222 Ill.2d 147, 193, 854 N.E.2d 635, 661 (2006) (*quoting Gilbert v. Sycamore Municipal Hospital*, 156 Ill.2d 511, 525, 622 N.E.2d 788, 795 (1993)). Defendants do not argue that Plaintiffs' facts cannot support an apparent-authority theory, and, at summary judgment, the moving party bears the initial burden of demonstrating that it is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 323. In any event, Plaintiffs' evidence that they went to Mt. Sinai because their prenatal doctor told them to do so, (Rodriguez Dep., at 23-24;

Maldonado Dep., at 35), and Dr. Green's testimony that she never informed Plaintiffs that she was an independent contractor, (Green Dep., at 25), may be sufficient to support an apparent-authority theory. *York,* 222 Ill.2d at 195-98, 854 N.E.2d at 662-63 (apparent-authority theory supported by evidence that patient chose hospital before choosing doctor at hospital, that the doctor wore scrubs or a lab coat with the hospital's logo, and that nothing in consent form alerted patient that the doctor was an independent contractor).

Rather than arguing that Plaintiffs' facts do not support an apparent-authority theory, Defendants assert that Plaintiffs cannot rely on apparent authority because they did not allege it in their complaint. (Defs' Reply Br. at 9.) That is not the law; a complaint is not required to plead legal theories. *Ortiz v. Downey*, 561 F.3d 664, 670 (7th Cir. 2009). Plaintiffs' allegation that Dr. Green was an agent of the hospital is sufficient, even under Illinois law, to put Defendants on notice of an apparent-authority theory. *Gilbert*, 156 Ill.2d at 527, 622 N.E.2d at 796; *Doe v. Brouillette*, 389 Ill.App.3d 595, 605, 906 N.E.2d 105, 115 (1st Dist. 2009).

Defendants' only other arguments for summary judgment in favor of Mt. Sinai are repeat versions of the arguments with respect to the individual Defendants, addressed earlier. For the reasons that Claims Five and Six against Lopez were dismissed, those claims are dismissed as to Mt. Sinai. And for the reasons that Defendants' motion was denied as to Claims One and Two against Dr. Dogan, the motion is denied as to Claims One and Two against Mt. Sinai. Thus, Defendants' motion is granted with respect to Claims Three, Four, Five, and Six but denied with respect to claims One and Two.

## CONCLUSION

For the foregoing reasons, Defendants Mt. Sinai, Lopez, and Dogan's Motion For Summary Judgment [34, 36] is granted with respect to Claims Three, Four, Five, and Six and denied with respect to Claims One and Two. The motions to strike by Plaintiffs [42] and by Defendants [47] are both denied.

ENTER:

Dated: January 6, 2010

_____
REBECCA R. PALLMEYER
United States District Judge